FILED

2018 OCT 18  PM 3: 37

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                       February 2018 Grand Jury

11   | UNITED STATES OF AMERICA, | CR No. 18-00050(A)-JAK |

12              Plaintiff,

13              v.

14   YI-CHI SHIH,
        aka "Yichi Shih,"
15      aka "Yuqi Shi,"
     ISHIANG SHIH,
16      aka "I-Shiang Shih,"
     KIET ANH MAI,
17   JIERU DENG,
        aka "Deng Jieru,"
18      aka "Angel Deng,"
     YAPING CHEN,
19      aka "Chen Yaping,"
     FEI YE,
20      aka "Yeh Fei,"
        aka "Michael Ye,"
21      aka "Michael Jackson,"
        aka "Michael Anderson,"
22      aka "Michael Dickinson," and
     YE YUAN,
23      aka "Yuan Ye."

24              Defendants.

25

**F I R S T**
**S U P E R S E D I N G**
**I N D I C T M E N T**

[50 U.S.C. § 1705(a),(c); 15
C.F.R. §§ 742.4, 744.16, 758.1,
764.2: Conspiracy and Violation of
the International Emergency
Economic Powers Act; 18 U.S.C.
§ 1341: Mail Fraud; 18 U.S.C.
§ 1343: Wire Fraud; 18 U.S.C.
§ 371: Conspiracy; 18 U.S.C.
§ 1030(a)(2)(C), (c)(2)(B)(i)-
(iii): Unauthorized Access to a
Protected Computer to Obtain
Information; 18 U.S.C.
§ 1956(a)(2)(A): International
Promotional Money Laundering; 18
U.S.C. § 1001(a)(1), (2): False
Statement to Government Agency; 26
U.S.C. § 7206(1) Subscribing to a
False Tax Return; 18 U.S.C. § 2:
Aiding and Abetting and Causing an
Act to be Done; 18 U.S.C.
§ 981(a)(1)(C), (a)(2) and 28
U.S.C. § 2461: Forfeiture]

26        The Grand Jury charges:

27                    <u>INTRODUCTORY ALLEGATIONS</u>

28        The following was true at all times relevant to this Indictment:

The International Emergency Economic Powers Act, Export
Administration Regulations, and Foreign Trade Regulations

1.   Pursuant to the International Emergency Economic Powers Act
("IEEPA"), Title 50, United States Code, Sections 1701-1707, the
President was granted the authority to declare a national emergency
to address unusual and extraordinary threats to the national
security, foreign policy, and economy of the United States.   The
President declared a national emergency through executive orders that
had the full force and effect of law.

2.   Pursuant to IEEPA, on August 17, 2001, the President issued
Executive Order 13,222, which declared a national emergency with
respect to the unusual and extraordinary threat to the national
security, foreign policy and economy of the United States in light of
the expiration of the Export Administration Act, 50 App. U.S.C.
§§ 2401-2420, which lapsed on August 17, 2001.   66 Fed. Reg. 44,025
(Aug. 22, 2001).   While in effect, the EAA regulated the export of
goods, technology, and software from the United States.   Pursuant to
the provisions of the EAA, the Department of Commerce ("DOC")'s
Bureau of Industry and Security ("BIS") promulgated the Export
Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which
contained restrictions on the export of goods outside of the United
States, consistent with the policies and provisions of the EAA.   See
15 C.F.R. § 730.2.   In Executive Order 13,222, pursuant to IEEPA, the
President ordered that the EAR's provisions remained in full force
and effect despite the expiration of the EAA.   Presidents have issued
annual Executive Notices extending the national emergency declared in
Executive Order 13,222 from the time period covered by that Executive

Order through the present.  See, e.g., 82 Fed. Reg. 39,005 (Aug. 18, 2017).

3.    Pursuant to its authority derived from IEEPA, the DOC reviewed and controlled the export of certain goods and technologies from the United States to foreign countries.  In particular, the DOC had placed restrictions on the export of goods and technologies that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.

4.    In addition, the EAR contained a list of names of certain foreign persons -- including businesses, research institutions, government and private organizations, individuals, and other types of legal persons -- that were subject to specific license requirements for the export, re-export and/or in-country transfer of specified items.  These persons comprised the DOC's "Entity List," which was found at Title 15, Code of Federal Regulations, Part 744, Supplement No. 4.  Grounds for inclusion on the Entity List included activities sanctioned by the U.S. State Department and activities contrary to U.S. national security and/or foreign policy interests.  The persons on the Entity List were subject to export licensing requirements and policies supplemental to those found elsewhere in the EAR.

5.    Through the EAR, the Department of Commerce ("DOC") imposed license or other requirements before an item (that is, commodities, software, and technology) subject to the EAR could be lawfully exported from the United States or lawfully re-exported from another country.  Items that "are subject to the EAR" included all items in the United States and all U.S.-origin items wherever located,

irrespective of whether a license was required for the export of that item (with certain exceptions described below). Activities of U.S. or foreign persons prohibited by any order issued under the EAR were also "subject to the EAR." Items not subject to the EAR were items exclusively controlled for export by other federal agencies and other specified items not relevant here.

6.   The DOC, through the U.S. Census Bureau ("Census") required the filing of electronic export information ("EEI") through the Automated Export System ("AES") pursuant to Title 13, United States Code, Section 305; the EAR; and the Foreign Trade Regulations ("FTR"), Title 15, Code of Federal Regulations, Part 30. The purpose of these requirements was to strengthen the United States government's ability to prevent the export of certain items to unauthorized destinations and end-users because the AES aids in targeting, identifying, and when necessary confiscating suspicious or illegal shipments prior to exportation. 15 C.F.R. § 30.1(b). With exceptions not relevant to the exports at issue in this Indictment, EEI was required to be filed for, among other things, the export of commodities valued over $2,500 per the Harmonized Tariff Schedule of the United States of America ("HTSUSA") commodity classification code. EEI was required to contain, among other things:  the names and addresses of the parties to the transaction; and the description, quantity, and value of the items exported. 15 C.F.R. § 30.6(a).

7.   United States citizens, resident aliens, and legal permanent residents of the United States were required to file an individual income tax return with the Internal Revenue Service reporting their worldwide income for each year if their gross income exceeded a certain amount.

8.    United States citizens, resident aliens, and legal permanent residents of the United States who had a financial interest in, or signature or other authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular calendar year were required to file with the Department of the Treasury a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 (later renamed FinCen Form 114) (hereinafter referred to as an "FBAR").  The FBAR for the applicable calendar year was due by June 30 of the following year. An "undeclared bank account" was a financial account maintained in a foreign country that was not reported to the United States government on a tax return and an FBAR.

Defendants and Related Entities

9.    Defendant YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi" ("defendant SHIH"), a dual citizen of Taiwan and the United States, who resided in the Central District of California and in foreign locations including China, was an electrical engineer and former employee of United States defense contractors.

10.    Defendant ISHIANG SHIH, aka "I-Shiang Shih" ("defendant ISHIANG"), a native of Taiwan and a citizen of Canada, was an electrical engineer and a professor at Canadian University A. Defendants SHIH and ISHIANG were brothers.

11.    Defendant KIET ANH MAI ("defendant MAI"), a United States citizen, who resided in the Central District of California, was an electrical engineer and former employee of a United States defense contractor.

12.    Defendant JIERU DENG, aka "Deng Jieru," aka "Angel Deng," ("defendant DENG") was a native and citizen of the People's Republic

of China ("PRC").   In 2011 to 2013, defendant DENG was employed as Vice-President/General Manager of Tian Hang Yang Pu Technology Investment Limited Company in Beijing.

13.   Defendant YAPING CHEN, aka "Chen Yaping" ("defendant CHEN"), a native and citizen of the PRC, was an electrical engineer. From 2005 to 2007, defendant CHEN was General Manager, Chief Technical Supervisor of Chengdu Dingtian Micro-Electronics Co., Ltd.

14.   Defendant FEI YE, aka "Yeh Fei," aka "Michael Ye," aka "Michael Jackson," aka "Michael Anderson," aka "Michael Dickinson" ("defendant YE") was a non-U.S. citizen.   Defendant FEI was Department Manager with Chengdu Dingtian Micro-Electronics Technology Co., Ltd.

15.   Defendant YE YUAN, aka "Yuan Ye" ("defendant YUAN"), a native and citizen of the PRC, was an electrical engineer.   Defendant YUAN was an electrical circuit designer.

16.   Chengdu Gastone Technology Co., Ltd., aka Chengdu Jiashi Technology Company, Ltd. ("CGTC"), was a Chinese entity that established, in Chengdu, China, a semiconductor fabrication plant (also called a foundry or a "fab") in which Monolithic Microwave Integrated Circuits ("MMICs"), a type of integrated circuit ("IC") device, would be manufactured.   From approximately 2011 through at least 2016, defendant SHIH was compensated for his work with CGTC; his positions at CGTC included President and Technical Consultant. Defendant ISHIANG's positions at CGTC included Technical Director.

17.   Qing'an International Trading Co., Ltd., aka Qing'an International Trading Group ("QTC") was a Chinese entity.   Defendant DENG was a QTC General Manager.

18.    Chengdu RML Technology Company, Ltd. ("CRML") was a Chinese entity formed in 2007, located in Chengdu, China.  Defendant CHEN was the General Manager, Chief Technical Supervisor of CRML.  Beginning in January 2012, defendant YUAN was a Chief Electrical Engineer/MMIC designer at CRML.  CRML owned Internet domain rml138.com, where it hosted, among other things, e-mail services.  Defendants SHIH, CHEN, DENG, YUAN, and other unindicted coconspirators all had and used e-mail addresses associated with the rml138.com domain (e.g. [personal identifier]@rml138.com).

19.    China Electronics Technology Group Corporation 29 Research Institute, aka China Southwest Electronic Equipment Research Institute (SWIEE), aka 29 (SIWEI co) Institute, aka Chengdu SIWEI Electronics Company ("CETC 29"), was a Chinese entity located in Chengdu, China.

20.    Chengdu Ganide Technology Company, Ltd., aka Chengdu Jiana Haiwei S&T Technology Co., Ltd. ("Chengdu Ganide") was a Chinese entity located in Chengdu, China that was engaged in research and development and sales of micro-systems, and the planning and construction of the CGTC foundry.  Chengdu Ganide's board of directors included defendants SHIH, CHEN, and DENG.

21.    On August 1, 2014, BIS placed CGTC, QTC, CETC 29, and Tian Hang Yang Pu Technology Investment Limited Company on its Entity List due to their involvement in activities contrary to the national security and foreign policy interest of the United States -- specifically, that they had been involved in the illicit procurement of commodities and technologies for unauthorized military end use in China.  CGTC, QTC, CETC 29, and Tian Hang Yang Pu Technology Investment Limited Company have remained on the Entity List

continuously since August 1, 2014.  As a result of their placement on the Entity List, a license from BIS was required to export, reexport, or transfer (in-country) any item  (that is, commodities, software, and technology) subject to the EAR to CGTC, QTC, or Tian Hang Yang Pu Technology Investment Limited Company, and there was a presumption of denial of a license.  See 79 FR 44681, 44684, 8/1/2014; 15 CFR § 744.11.

22.  Pullman Lane Productions, LLC ("PULLMAN LANE") was a California limited liability company.  Defendant SHIH held a 90% interest in PULLMAN LANE and was its Manager.  PULLMAN LANE had two U.S. bank accounts; defendant SHIH was an authorized signer on both accounts.  From 2010 to the present, both before and after CGTC was placed on Entity List, the PULLMAN LANE U.S. bank accounts received substantial international wire transfers (up to $1,000,000) from foreign companies, including QTC.

23.  JYS Technologies, Inc. ("JYS TECH") was a Canadian corporation, located in Brossard, Quebec, Canada.  Defendant ISHIANG was its Vice President and one of its Directors.  JYS TECH had a Canadian bank account that was controlled by defendant ISHIANG.  Both before and after CGTC was placed on the Entity List, the JYS TECH bank account wire-transferred substantial funds to the PULLMAN LANE and MICROEX bank accounts.

24.  Microex Engineering ("MICROEX") was a dba of L2Kontemporary, Inc., a California corporation.  Defendant MAI was the Chief Executive Officer of MICROEX and L2Kontemporary, Inc. MICROEX had a U.S. bank account; defendant MAI was an authorized signer on the account.  At no time was defendant SHIH an employee or agent or otherwise affiliated with MICROEX.  Both before and after

CGTC was placed on the Entity List, the MICROEX bank account received substantial payments from bank accounts held by PULLMAN LANE and JYS Technologies, Inc.

25. Mystical Optimism, Inc. ("Mystical Optimism"), was a corporation based in the British Virgin Islands. Mystical Optimism had a bank account in Hong Kong that was controlled by Person 17. Beginning as early as June 2011, and continuing until December 2012, defendant CHEN caused substantial funds to be deposited into the Mystical Optimism bank account. Defendant CHEN directed Person 17 to distribute these funds to other individuals, including defendants SHIH and ISHIANG.

26. U.S. Company B was a U.S. company located in the United States in a state other than California that offered foundry services for the custom design and manufacture of MMICs, including GaN (Gallium Nitrade) MMICs.

27. U.S. University A is located within the Central District of California. From December 2012 through August 2013, defendant YUAN worked as a visiting scholar in the Electrical Engineering Department of U.S. University A.

28. Standard Chartered Bank (Hong Kong) Limited, was a bank incorporated in Hong Kong and licensed with the Hong Kong Monetary Authority.

29. During the calendar years 2013 through 2015, Coutts & Co., Ltd., was a private wealth management bank, based in the United Kingdom, with branch offices in multiple locations, including Hong Kong.

30. The individuals identified herein as Persons 3, 4, 5, 6, and 17 were U.S. persons.

31.    The Grand Jury incorporates by reference and re-alleges these Introductory Allegations into each and every count of this Indictment as though fully alleged therein.

COUNT ONE

[50 U.S.C. § 1705(a), (c);

15 C.F.R. §§ 742.4, 744.16, 758.1, 764.2]

A.    OBJECT OF THE CONSPIRACY

Beginning on a date unknown, but no later than in or about January 2006, and continuing to a date unknown, but no earlier than on or about January 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi" ("defendant SHIH"), ISHIANG SHIH, aka "I-Shiang Shih" ("defendant ISHIANG"), KIET ANH MAI ("defendant MAI"), JIERU DENG, aka "Deng Jieru," aka "Angel Deng," ("defendant DENG"), YAPING CHEN, aka "Chen Yaping" ("defendant CHEN"), FEI YE, aka "Yeh Fei,"aka "Michael Ye," aka "Michael Jackson," aka "Michael Anderson," aka "Michael Dickinson" ("defendant YE"), and YE YUAN, aka "Yuan Ye" ("defendant YUAN"), and others known and unknown to the Grand Jury, knowingly and willfully conspired and agreed with each other to export items from the United States to the PRC and to Chengdu Gastone Technology Co., Ltd., aka Chengdu Jiashi Technology Company, Ltd. ("CGTC"), without having first obtained the required licenses from the United States Department of Commerce and without filing Electronic Export Information ("EEI") through the Automated Export System ("AES").

B.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

The object of the conspiracy was to be accomplished in the manner and by the means described below, among others:

1.    Defendants SHIH, ISHIANG, DENG, CHEN, YE, YUAN, and others would agree to develop the high-power integrated circuit ("IC")

11

industry in the PRC, which included the establishment of a foundry in the PRC in which MMICs having military applications would be manufactured.

2.    Defendant YE would ask defendant SHIH to obtain equipment, including equipment subject to U.S. export controls, to further the development of the high-power IC industry in the PRC.

3.    Defendant DENG would cause money to be disseminated to fund the development of the high-power IC industry in the PRC, including the deposit of money into a PULLMAN LANE bank account.

4.    Defendant CHEN would cause funds to be deposited into a Hong Kong based bank account held in the name of Mystical Optimism, and controlled by Person 17.  Defendant CHEN would subsequently cause these funds to be disseminated to various individuals, including defendants SHIH and ISHIANG, as compensation for their work assisting in the development of the high-power IC industry in the PRC.

5.    Defendant SHIH would open a financial account with Standard Chartered Bank (Hong Kong) Limited that he did not disclose to the United States Department of the Treasury, and into which he would direct that funds payable to him be deposited.

6.    Defendant MAI would make arrangements with U.S. Company B to obtain U.S. Company B's foundry services and the resulting MMICs.

7.    To obtain access to U.S. Company B's foundry services and to obtain the resulting MMICs, defendant MAI would make false statements to U.S. Company B about the ultimate end user and country destination of the resulting MMICs.

8.    Defendant MAI would provide defendant SHIH with access to U.S. Company B's foundry services without U.S. Company B's knowledge or authorization.

9.   Using U.S. Company B's foundry services, defendants SHIH, YUAN, and persons associated with CRML and CGTC would design the integrated circuits for the resulting MMICs.

10.   Defendant MAI would cause MICROEX to pay U.S. Company B for the foundry services and resulting MMICs.

11.   Defendants SHIH and ISHIANG would cause PULLMAN LANE and JYS TECH to pay defendant MAI for the payments MICROEX made to U.S. Company B.

12.   Defendant SHIH would direct the transfer of funds through Chinese entities into PULLMAN LANE and JYS TECH bank accounts for the payments made to MAI for the payments MICROEX made to U.S. Company B.

13.   Defendant MAI would receive the shipments of the resulting MMICs from U.S. Company B and provided them to defendant SHIH directly or through Person 6.

14.   Defendant SHIH would cause the U.S. Company B MMICs to be shipped from the Central District of California to an address in Hong Kong intending that the MMICs be transported to the PRC.

15.   To export the U.S. Company B MMICs from the United States to the PRC, defendant SHIH would make and cause to be made false statements to shipping companies about the value and description of the MMICs.

16.   Defendant SHIH would cause the U.S. Company B MMICs to be provided to U.S. University A for testing for the purpose of providing technology relating to the MMICs to CGTC.

17.   Defendant SHIH would cause the U.S. Company B MMICs to be shipped from the Central District of California to defendant ISHIANG in Canada for the purpose of providing technology relating to the MMICs to CGTC.

18. At no time would defendants SHIH, ISHIANG, MAI, DENG, CHEN, YE, YUAN, or anyone associated with them, either individually or through MICROEX, PULLMAN LANE, JYS TECH, CGTC, CRML, or QTC apply for or obtain an export license from the United States Department of Commerce authorizing the export of the U.S. Company B MMICs to the PRC or authorizing the export of the MMICs to CGTC.

19. At no time would defendants SHIH, ISHIANG, MAI, DENG, CHEN, YE, YUAN, or anyone associated with them, either individually or through MICROEX, PULLMAN LANE, JYS TECH, CGTC, CRML, or QTC, file EEI through AES for the shipments of the U.S. Company B MMICs.

20. As referenced in this Indictment, defendants SHIH, ISHIANG, MAI, DENG, CHEN, YE, and YUAN would often use electronic mail ("e-mail") to communicate, in the English and Chinese languages, with each other and with other persons. All direct quotations from e-mails referenced herein are as they appeared in the e-mails in the English language, including any misspellings, and are related in pertinent part.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the object of the conspiracy, defendants SHIH, ISHIANG, MAI, DENG, CHEN, YE, YUAN and others known and unknown to the Grand Jury, committed the following overt acts, among others, within the Central District of California, and elsewhere.

Overt Act #1:  On or about April 21, 2006, defendant YE sent an e-mail to defendant SHIH asking defendant SHIH to bring to the PRC certain items, at least one of which required an export license to be exported from the United States to China.

1    *Overt Act #2:*  On or about May 18, 2006, defendant YE sent an e-
2    mail to defendant SHIH that contained an attachment for an "IC
3    project."

4    *Overt Act #3:*  On or about May 19, 2006, defendant SHIH sent an
5    e-mail to defendant YE advising that to put together the requested
6    business plan, defendant SHIH would obtain more information on
7    technology, pricing, and fabrication from various foundries.

8    *Overt Act #4:*  On or about June 25, 2006, defendant YE sent an
9    e-mail to defendant SHIH advising that they were going to discuss the
10   business plan with a potential investor.

11   *Overt Act #5:*  On or about June 28, 2006, defendant SHIH sent an
12   e-mail to defendant YE that contained an attachment titled
13   "Development of MMIC Power Amplifier Chipset" that described a
14   development effort that would lead to the development of MMIC power
15   amplifiers at higher frequencies up to W-band and higher power
16   levels.

17   *Overt Act #6:*  On or about July 2006, defendant SHIH and Person
18   6 established PULLMAN LANE.

19   *Overt Act #7:*  On or about July 2007, defendants SHIH and
20   ISHIANG established JYS TECH.

21   *Overt Act #8:*  On or about October 2007, defendant CHEN became
22   the General Manager, Chief Technical Supervisor, of CRML.

23   *Overt Act #9:*  On or about January 27, 2010, defendant ISHIANG
24   sent an e-mail to defendant SHIH that contained two attachments:
25   (1) the DOC Entity List, dated 1/13/10, and (2) a document titled
26   "Q&As on the Bureau of Industry and Security's China Policy Rule,"
27   that discussed, among other topics, export-controlled technologies,
28   questions on "military end-use," and descriptions of major weapons

systems and policy review for national security export-controlled items.

Overt Act #10:  On or about February 23, 2010, defendant SHIH sent an e-mail to Person 3 and defendant CHEN attached to which were documents describing equipment used in the manufacture of MMICs.

Overt Act #11:  On or about June 14, 2010, defendant DENG caused $1,000,000 to be transferred from a QTC bank account to a PULLMAN LANE bank account.

Overt Act #12:  On or about June 18, 2010, defendant SHIH signed a check transferring from one PULLMAN LANE bank account to another, $1,000,000 received four days earlier from a Bank of China account held by QTC.

Overt Act #13:  On or about July 22, 2010, defendant ISHIANG caused $239,990 to be wire-transferred from a JYS TECH bank account in Canada to a PULLMAN LANE bank account.

Overt Act #14:  On or about October 27, 2010, defendant SHIH sent an e-mail to defendant ISHIANG conveying information about an October 2010 meeting of the Chengdu Ganide board of directors, including defendants SHIH, CHEN, and DENG.  Attached to the e-mail was a report of the meeting that stated that Chengdu Ganide's five year plan included military products, CGTC's largest shareholder was "Siwei" (CETC 29), and that CGTC would specialize in, among other things, the design, chip testing, and manufacturing of GaN wafers and chips.

Overt Act #15:  On or about April 7, 2011, defendant ISHIANG caused $199,990 to be wire-transferred from a JYS TECH bank account in Canada to a PULLMAN LANE bank account.

Overt Act #16:   On or about April 27, 2011, defendant SHIH executed account opening documents for a bank, investment, and/or financial account with Standard Chartered Bank (Hong Kong) Limited.

Overt Act #17:   On or about June 1, 2011, defendant CHEN caused $3,399,963.27 to be deposited into a bank account controlled by Person 17 and held in the name of Mystical Optimism.

Overt Act #18:   On or about August 20, 2011, defendant CHEN provided to Person 17 the account number for defendant SHIH's financial account at Standard Chartered Bank (Hong Kong) Limited.

Overt Act #19:   On or about August 20, 2011, defendant CHEN directed that Person 17 could begin to pay defendant SHIH $67,000 per month.

Overt Act #20:   On or about November 10, 2011, defendant ISHIANG caused $199,990 to be wire-transferred from a JYS TECH bank account in Canada to a PULLMAN LANE bank account.

Overt Act #21:   On or about March 5, 2012, defendant SHIH caused a PULLMAN LANE bank account to wire-transfer $500,000 to a JYS TECH bank account in Canada.

Overt Act #22:   On or about April 6, 2012, defendant SHIH sent an e-mail to a family member stating, "My cell phone in China is [number deleted] and Ishiang's is [number deleted].  Also attached is a copy of our business paln [sic] for the project . . . We will be in Chengdu until later part of April.  Please ask your friend to contact us."  Attached to the e-mail was a power point presentation; in the corner of every page was: "Ishiang Shih and Yi-Chi Shih."  The presentation was a business plan for the development of a semiconductor foundry in the PRC to manufacture MMICs.  U.S. Company

B and other U.S. companies were referenced in the presentation on a page titled "GaN Device Technology Comparison."

Overt Act #23:  On or about May 11, 2012, defendant SHIH caused a PULLMAN LANE bank account to wire-transfer $260,000 to a JYS TECH bank account in Canada.

Overt Act #24:  On or about May 30, 2012, defendant ISHIANG sent an e-mail to defendant SHIH, attaching a presentation titled "Development of GaN HEMT for MMICs" that provided engineering data on the performance of GaN devices and listed data on GaN devices from U.S. Company B.

Overt Act #25:  On or about June 30, 2012, defendant ISHIANG sent an e-mail to defendant SHIH, attaching a presentation dated 2011 titled "GaN Foundry" that provided engineering data on the performance of GaN devices from U.S. companies and included a list of U.S. companies with a GaN foundry, including U.S. Company B.  The header on each page of the presentation was  "CHENGDU GASTONE TECHNOLOGY CO., LTD" (written in English and Chinese).

Overt Act #26:  On or about August 21, 2012, defendant ISHIANG sent an e-mail to defendant SHIH attaching a presentation titled "A brief summary on GaN activities."  The presentation included a reference to the SiC (Silicon Carbide) and GaN MMIC foundry services of U.S. Company B.

Overt Act #27:  On or about September 24, 2012, defendant MAI caused IC-related equipment valued at more than $2,500 to be exported to defendant ISHIANG in Chengdu, PRC, without filing an EEI through the AES, by making false statements to a shipping company about the value of the IC-related equipment being shipped.

Overt Act #28:   On or about October 11, 2012, defendant YUAN sent an e-mail to defendant SHIH, attaching data sheets for GaN MMICs manufactured by U.S. Company B and U.S. Company E, and advising that U.S. Company B's product appeared to be better than U.S. Company E's.

Overt Act #29:   On or about January 10, 2013, defendant YUAN sent an e-mail to U.S. Company B asking to purchase GaN MMICs to support his research at U.S. University A.

Overt Act #30:   On or about January 23, 2013, defendant YUAN sent an e-mail to defendant SHIH informing him that because U.S. Company B required a non-disclosure agreement, defendant YUAN was advised it was not proper to purchase the GaN MMICs from U.S. Company B at that time.

Overt Act #31:   On or about February 15, 2013, defendant MAI, using a MICROEX e-mail address, sent an e-mail to U.S. Company B, with the subject "Foundry service," stating "I'm interested in the Full-Wafer Service for GaN, 0.25um process.  Please send documents to: Kiet Mai, President, MicroEx Engineering."

Overt Act #32:   On or about February 15, 2013, defendant MAI sent an e-mail to defendant SHIH, stating "Please answer the attached for me, I don't want to make any mistakes."  Attached to the e-mail was a "[U.S. Company B] Export Compliance Questionnaire" that defendant MAI had received from U.S. Company B in response to the e-mail described in Overt Act #13.

Overt Act #33:   On or about February 15, 2013, defendant SHIH sent an e-mail to defendant MAI, attaching the completed U.S. Company B Export Compliance Questionnaire.  The space provided for a "no" response was checked in response to questions as to whether the product would be subject to "U.S. export control regulations,

specifically EAR and ITAR."  (The International Traffic in Arms Regulations ("ITAR"), are the implementing regulations for the Arms Export Control Act ("AECA"), and regulate the export of United States defense articles and services.)

Overt Act #34:  On or about February 18, 2013, defendant MAI, using a MICROEX e-mail address, e-mailed U.S. Company B and returned the completed U.S Company B Export Questionnaire.  In the U.S Company B Export Questionnaire, the frequency of the MMICs to be designed and manufactured was listed as "up to 18 GHz."

Overt Act #35:  On or about February 18, 2013, defendant MAI, using a MICROEX e-mail address, sent an e-mail to U.S. Company B answering "yes," in response to the question, "Will your company be doing the design, testing and use of the MMIC's?"

Overt Act #36:  On or about March 19, 2013, defendant MAI sent an e-mail to defendant SHIH advising him that defendant MAI would forward to defendant SHIH the information he had received from U.S. Company B and stating further, "The only issues would be end user and itar and you already are aware of those."

Overt Act #37:  On or about March 19, 2013, defendant MAI sent an e-mail to defendant SHIH, stating "Here's design access," that provided to defendant SHIH the internet address for the design portal on U.S. Company B's computer, as well as the user name and password necessary to access that design portal.

Overt Act #38:  On or about August 29, 2013, defendant MAI sent an e-mail to defendant SHIH informing defendant SHIH that U.S. Company B wanted to know when they would place a purchase order, and that defendant MAI told U.S. Company B, "we're finalizing the layout and [would] get back to them early next week."

1      Overt Act #39: On or about August 29, 2013, defendant SHIH sent
2   an e-mail to defendant MAI, responding to the e-mail in Overt Act
3   #37, writing, "Good answer! We do plan to release the PO [purchase
4   order] next week."

5      Overt Act #40: On or about September 3, 2013, defendant MAI e-
6   mailed U.S. Company B, attaching a purchase order from MICROEX that
7   listed payment milestones totaling $130,000 for "Delivery of 4 good
8   wafers [MMICs]."

9      Overt Act #41: On or about September 6, 2013, defendant MAI
10  caused a MICROEX invoice to be issued that billed PULLMAN LANE for
11  milestone payment 1 -- $28,750 -- for the "NPN, Wideband, High Power
12  GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S.
13  Company B.

14     Overt Act #42: On or about September 9, 2013, defendant SHIH
15  caused a check to be issued, written on a PULLMAN LANE bank account,
16  in the amount of $28,750, made payable to MICROEX.

17     Overt Act #43: On or about September 11, 2013, defendant MAI
18  caused a check to be issued, written on a MICROEX bank account, in
19  the amount of $25,000, made payable to U.S. Company B.

20     Overt Act #44: On or about September 18, 2013, defendant MAI e-
21  mailed to defendant SHIH a U.S. Company B confidential and
22  proprietary document intended to aid the design of custom MMICs to be
23  manufactured by U.S. Company B.

24     Overt Act #45: In October 2013, defendant SHIH e-mailed to
25  defendant YUAN and others U.S. Company B's corrections on the designs
26  for the custom MMICs to be manufactured by U.S. Company B.

27     Overt Act #46: On or about November 18, 2013, defendant SHIH
28  sent an e-mail to an individual at a CRML e-mail account directing

the individual to make the following arrangement: "Z5:  $200,000 to California through Macau."

Overt Act #47:  On or about November 22, 2013, defendant MAI caused a MICROEX invoice to be issued that billed PULLMAN LANE for a milestone payment -- $40,250 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #48:  On or about November 22, 2013, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $41,228, made payable to MICROEX.

Overt Act #49:  On or about December 2, 2013, defendant MAI caused a check to be issued, written on a MICROEX bank account, in the amount of $35,000, made payable to U.S. Company B.

Overt Act #50:  On or about December 6, 2013, defendant MAI caused a MICROEX invoice to be issued that billed PULLMAN LANE for milestone payment 3 -- $69,000 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #51:  On or about December 11, 2013, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $69,000, made payable to MICROEX.

Overt Act #52:  On or about December 16, 2013, defendant MAI sent an e-mail to defendant SHIH informing defendant SHIH that U.S. Company B wanted the last invoice paid before shipping the MMICs, and that defendant MAI would send defendant SHIH the final invoice as soon as defendant MAI received U.S. Company B's invoice.

Overt Act #53:  On or about December 17, 2013, defendant MAI caused a MICROEX invoice to be issued that billed PULLMAN LANE for

milestone payment 4 -- $11,500 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #54:  On or about December 18, 2013, defendant MAI sent an e-mail to defendant SHIH informing defendant SHIH, "I remitted payment for the final invoice today, [U.S. Company B] should receive it this week.  I'll check with them by the end of this week for the expected delivery of the wafers."

Overt Act #55:  On or about December 24, 2013, defendant MAI caused $70,000 to be wire-transferred to U.S. Company B.

Overt Act #56:  On or about December 25, 2013, defendant SHIH sent an e-mail to an individual at a CRML e-mail account directing the individual to wire money to defendant SHIH's Standard Charter Bank account.

Overt Act #57:  On or about December 27, 2013, defendant MAI sent an e-mail to defendant SHIH, writing "I have the wafers."

Overt Act #58:  On or about December 27, 2013, defendant SHIH sent an e-mail to defendant MAI, responding to the e-mail described above in Overt Act #35, writing, "Super.  I'm out of town.  I'll pick it up this weekend.  Thanks."

Overt Act #59:  On or about December 29, 2013, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $30,000, made payable to Person 3.

Overt Act #60:  On or about December 30, 2013, defendant SHIH caused a package containing the U.S. Company B MMICs to be shipped from Los Angeles, California, to Person 4 in Northern California, causing the package contents to be valued falsely as $100.00.

Overt Act #61:   On or about December 31, 2013, defendant SHIH sent an e-mail to Persons 3 and 5, with the subject, "RE: Package," writing, "A package was sent from LA should arrive today by FedEx tracking No.: 804546557495.  Please follow up."

Overt Act #62:   On or about January 2, 2014, defendant SHIH caused the package containing the U.S. Company B MMICs to be shipped from Northern California to a freight forwarding service in Hong Kong, and caused the content of the package to be described falsely as "Glass Sample," and the package contents to be valued falsely as "$100.00."

Overt Act #63:   On or about January 2, 2014, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $11,500, made payable to MICROEX.

Overt Act #64:   On or about January 4, 2014, defendant SHIH sent an e-mail to Person 3, with the subject "Re: Package," writing, "Please send me the tracking no.  To follow up."

Overt Act #65:   On or about January 6, 2014, defendant SHIH sent an e-mail to an individual at a CRML e-mail account, copying defendant YUAN, providing the tracking number for the package containing the U.S. Company B MMICs.

Overt Act #66:   On or about January 15, 2014, defendant YUAN sent an e-mail to defendant SHIH advising that the U.S. Company B MMICs had been received in the PRC and testing of the U.S. Company B MMICs had begun.

Overt Act #67:   On an unknown date, defendant SHIH provided one of the U.S. Company B MMICs to a researcher at U.S. University A for testing.

1     Overt Act #68: On or about March 19, 2014, defendant SHIH sent

2 an e-mail to defendant MAI, writing, "[T]he GaN MMIC's are still

3 under evaluation. Some of them have good performance. We are

4 looking [sic] potential customers for the Ku-band chips for satcom

5 applications. Please ask [U.S. Company B] about the pricing for

6 production wafers of the order of 30 to 60 wafers."

7     Overt Act #69: On or about March 19, 2014, defendant MAI sent

8 an e-mail to defendant SHIH, writing, "In regard to [U.S. Company B],

9 have you checked the ITAR on these parts due to high power?"

10     Overt Act #70: On or about June 16, 2014, defendant MAI, using

11 a MICROEX e-mail address, sent an e-mail to U.S. Company B, writing,

12 "We'd like to have another wafer run . . . . Please quote with new

13 payment terms for a run same as last run."

14     Overt Act #71: On or about August 10, 2014, an unindicted

15 coconspirator sent an e-mail to defendants SHIH and CHEN, among

16 others, and copying defendants ISHIANG and DENG, among others,

17 responding to an e-mail sent previously by defendant SHIH, the

18 subject of which was "About salary." The unindicted coconspirator's

19 e-mail discussed CGTC's lack of funds, stating, in substance, among

20 other things, that after "Siwei's" funds came in, the upper-level

21 organization said there would be no additional investment.

22     Overt Act #72: On or about December 1, 2014, defendant MAI,

23 using a MICROEX e-mail address, sent to U.S. Company B a purchase

24 order from MICROEX, for a payment schedule by milestones of $130,000

25 total.

26     Overt Act #73: On or about December 1, 2014, defendant MAI,

27 using a MICROEX e-mail address, answered an e-mail from U.S. Company

28 B, asking "Will you be exporting any of the devices or wafers?" The

answer provided by defendant MAI was "No not for export, we're doing development."

Overt Act #74:  On or about December 1, 2014, defendant MAI, using a MICROEX e-mail address, sent an e-mail to U.S. Company B, advising that MICROEX would go with the full payment option, and attaching a revised purchase order from MICROEX, for a full payment of $117,000.

Overt Act #75:  On or about December 1, 2014, defendant MAI caused a MICROEX invoice to be issued that billed JYS TECH for milestone payment 1 -- $120,000 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #76:  On or about December 2, 2014, defendant SHIH sent an e-mail to defendant ISHIANG, writing, "Please prepare to wire the payment of 117K to MicroEx, whose bank account is attached. . . . The funding for this project is being arranged to JYS, but may take some time.  I'll explain to you on the arrangement later."

Overt Act #77:  On or about December 2, 2014, defendant ISHIANG sent an e-mail to defendant SHIH, writing, "I will arrange the payment soon."

Overt Act #78:  On or about December 10, 2014, defendant MAI, using a MICROEX e-mail address, answered an e-mail from U.S. Company B, asking "Are any of the design[s] you are putting on this next mask subject to US ITAR export regulations?"  The answer provided by defendant MAI was "These are for research study and should not [sic] subject to ITAR."

Overt Act #79:  On or about December 12, 2014, defendant ISHIANG caused $120,000 to be wire-transferred from a JYS TECH bank account to a MICROEX bank account.

Overt Act #80:  On or about December 17, 2014, defendant MAI caused $117,000 to be wire-transferred to U.S. Company B.

Overt Act #81:  On or about December 31, 2014, defendant SHIH sent an e-mail to the Vice-President of CGTC discussing an attached revised proposed business plan, and stating, "We should focus on these tasks for now while we do the detailed planning for establishing GaStone Technology to be a strong foundry like WIN or [initials of a U.S. company]."

Overt Act #82:  On or about January 12, 2015, defendant SHIH received from a researcher at U.S. University A a copy of a 30-page report summarizing testing conducted on a U.S. Company B GaN MMIC, that defendant SHIH caused to be done.

Overt Act #83:  On or about March 17, 2015, defendant SHIH sent an e-mail to Person 6, with the subject "Package," writing, "I need your help to pick up a package from [defendant MAI] this coming Friday or Saturday, as soon as it arrives. . . . After that, we need to take one out of four pieces and pack it separately for delivery. . . . We'll talk over FaceTime to go through the details when you have the package ready."

Overt Act #84:  On or about March 18, 2015, defendant SHIH sent an e-mail to defendant MAI, telling him to call Person 6 to pick up the package for defendant SHIH when it arrived.

Overt Act #85:  On or about March 23, 2015, defendant MAI sent an e-mail to defendant SHIH, writing "I left [Person 6] voice and text messages for picking up the wafers, which arrived today."

1    **Overt Act #86:**  On or about March 23, 2015, defendant MAI caused
2    a MICROEX invoice to be issued that billed JYS TECH for the final
3    payment -- $14,550 -- for the "NPN, Wideband, High Power GaN MMIC
4    Design, Analysis, Layout & Test Support" provided by U.S. Company B.

5    **Overt Act #87:**  On or about March 25, 2015, defendant MAI sent
6    an e-mail to defendant SHIH, writing, "[Person 6] picked-up the
7    wafers today, wafers' data/packing slip attached."  Attached to the
8    e-mail was a U.S. Company B packing slip that listed 4 diced wafers:
9    BU1823-11, HG0752-36, JE0628-20 and JH0727-45, valued at $9,000.

10   **Overt Act #88:**  On or about April 6, 2015, defendant SHIH sent
11   an e-mail to Person 6, instructing that the package should be sent to
12   defendant ISHIANG, in Canada, and further, "indicate this is a glass
13   sample for testing and evaluation purpose in the description box and
14   declare a value of $50."  Defendant SHIH instructed further, "get a
15   box and some packaging materials in preparation for a second sample."

16   **Overt Act #89:**  On or about April 14, 2015, defendant ISHIANG
17   sent an e-mail to defendant SHIH advising that the sample for tests
18   had been received.

19   **Overt Act #90:**  On or about April 17, 2015, defendant MAI sent
20   an e-mail to defendant SHIH asking whether JYS TECH would be sending
21   the last payment to MICROEX soon for the U.S. Company B wafers, and
22   attaching a MICROEX invoice to JYS TECH for $14,550.

23   **Overt Act #91:**  On or about June 6, 2015, an unindicted
24   coconspirator using a CRML e-mail account, sent an e-mail to
25   defendant SHIH, copying defendant YUAN, attaching a power point
26   presentation documenting testing performed on a U.S. Company B wafer
27   referenced in Overt Act #87.

28

Overt Act #92:   On or about October 19, 2015, defendant SHIH caused to be issued a check, written on a PULLMAN LANE bank account, in the amount of $14,550, made payable to MICROEX.

Overt Act #93:   On or about January 6, 2016, defendant SHIH sent an e-mail to the Vice-President of CGTC requesting compensation owed to him by CGTC.

Overt Act #94:   On or about January 8, 2016, defendant SHIH sent an e-mail to the Vice-President of CGTC, advising that defendant SHIH "accept[ed] the amount for the portion paid directly by GaStone" and asking "Please make the payment at your earliest convenience."

COUNT TWO

[50 U.S.C. § 1705(a), (c); 18 U.S.C. § 2(b);

15 C.F.R. §§ 742.4, 764.2]

On or about December 30, 2013, to January 2, 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendant YI-CHI SHIH, aka "Yichi Shih," aka "Yuqi Shi," knowingly and willfully caused to be exported from the United States to the People's Republic of China ("PRC"), items under the jurisdiction of the United States Department of Commerce, namely, Monolithic Microwave Integrated Circuit ("MMIC") Amplifiers, without first having obtained the required license from the United States Department of Commerce.

During the above-specified time period, the MMIC Amplifiers were controlled for national security reasons, and a license from the Department of Commerce was required under the EAR for the export or reexport of these items to the PRC.

COUNTS THREE THROUGH SIX

[18 U.S.C. § 1341]

A.    THE FRAUDULENT SCHEME

1.    Beginning on an unknown date but no later than February 15, 2013, and continuing through on or about an unknown date but no earlier than October 30, 2015, in Los Angeles County, within the Central District of California and elsewhere, defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi" ("defendant SHIH"), and KIET ANH MAI ("defendant MAI"), together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud U.S. Company B as to material matters, and to obtain money and property from U.S. Company B by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

B.    MEANS TO ACCOMPLISH THE FRAUDULENT SCHEME

2.    The fraudulent scheme was carried out, in substance, as follows:

a.    Defendant SHIH would seek U.S. Company B's MMIC design technology to aid in CGTC's establishment of a foundry in China where MMICs would be designed and manufactured.

b.    With defendant SHIH's knowledge and agreement, defendant MAI would contact U.S. Company B and knowingly represent falsely that defendant MAI's company, MICROEX, was interested in purchasing U.S. Company B's MMIC design service, and that the resulting MMICs would remain in the United States and not be exported.

31

c.   With defendant SHIH's knowledge and agreement, defendant MAI would also knowingly falsely agree in writing to comply with all of U.S. Company B's contractual requirements for the protection of its proprietary technology in order to gain access to U.S. Company B's design portal.

d.   With defendant SHIH's knowledge and agreement, defendant MAI would, contrary to his written contract with U.S. Company B, knowingly provide to defendant SHIH the user name and password that U.S. Company B provided to defendant MAI alone pursuant to the written contract.

e.   With defendant MAI's knowledge and agreement, defendant SHIH would, without authorization, knowingly access the design portal in U.S. Company B's computer, using the user name and password provided to him by defendant MAI.

f.   With defendant MAI's knowledge and agreement, defendant SHIH would complete the design for the MMICs by knowingly accessing without authorization the design portal, and U.S. Company B would manufacture the MMICs as designed by defendant SHIH.

g.   With defendant SHIH's knowledge and agreement, defendant MAI would knowingly cause U.S. Company B to ship the manufactured MMICs to defendant MAI, and defendant MAI would then knowingly provide the MMICs to defendant SHIH.

h.   Defendant SHIH would knowingly cause at least one of the MMICs to be shipped to Hong Kong, knowing it would be transported from there to China, and at least one of the MMICs to be shipped to Canada, and defendant SHIH would knowingly cause false statements about the description and value of the MMICs to be made on the airway bills for these shipments.

32

i.   Defendant MAI, through MICROEX, would knowingly pay U.S. Company B for the design service and the MMICs, and defendant SHIH would knowingly cause PULLMAN LANE and JYS TECH to repay defendant MAI for the cost of the design service and the MMICs, plus additional money to compensate defendant MAI for his role in the transactions.

3.   At the time defendants SHIH and MAI knowingly made and caused the above-described material false and fraudulent pretenses, representations, and promises, and concealed and omitted and caused to be concealed and omitted material facts as set forth above, defendants SHIH and MAI knew that the material pretenses, representations, and promises were false, that material information was concealed and omitted, and that their acts and omissions were fraudulent and deceptive.

4.   The above-described false and fraudulent pretenses, representations, and promises, and concealment and omissions made by and caused by defendants SHIH and MAI were material because if U.S. Company B had known that defendant MAI intended to provide defendant SHIH access to its MMIC design portal in its computer, and that the resulting MMICs would not remain in the United States, it would not have done one or more of the following: allowed defendant MAI to access its design portal; provided defendant MAI its design services; or allowed defendant MAI to purchase the resulting MMICs.

D.   RESULTS OF THE FRAUDULENT SCHEME

5.   As a result of the fraudulent scheme, CGTC was able to obtain access to U.S. Company B's proprietary technology to use in establishing a MMIC foundry in China, which caused U.S. Company B to

1  lose future profits and a commercial advantage over foreign-based

2  competitors.

3  E.   THE USE OF THE MAIL TO EXECUTE THE FRAUDULENT SCHEME

4      6.   On or about the dates set forth below, defendants SHIH and

5  MAI, together with others known and unknown to the Grand Jury, for

6  the purpose of executing and attempting to execute the above

7  described scheme to defraud, caused to be deposited the following

8  items to be sent and delivered by a commercial interstate carrier

9  according to the directions thereon:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| THREE | 12/26/13 | 4 MMICs from U.S. Company B to Torrance, California via FedEx |
| FOUR | 1/2/14 | At least 1 MMIC from California to Hong Kong via DHL Express |
| FIVE | 3/20/15 | 4 MMICs from U.S. Company B to Torrance, California via FedEx |
| SIX | 4/6/15 | At least 1 MMIC from California to Canada via UPS |

COUNTS SEVEN THROUGH EIGHT

[18 U.S.C. §§ 1343, 2(b)]

The Grand Jury incorporates by reference and re-alleges the allegations in Counts Four through Seven, Sections A through D, into Counts Eight through Nine as though fully alleged therein.

THE USE OF INTERSTATE WIRES

On or about the dates set forth below, defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi" ("defendant SHIH"), and KIET ANH MAI ("defendant MAI"), together with others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the above described scheme to defraud, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| SEVEN | 12/24/13 | a wire transfer of $70,000, from a Morgan Stanley account number ending in -053 to a U.S. Company B bank account |
| EIGHT | 12/17/14 | a wire transfer of $117,000, from a Morgan Stanley account number ending in -361 to a U.S. Company B bank account |

COUNT NINE

[18 U.S.C. § 371; 18 U.S.C. § 1030(a)(2)(C), (c)(2)(B)(i)-(iii)]

A.   THE OBJECT OF THE CONSPIRACY

1.     Beginning on an unknown date but no later than February 15, 2013, and continuing through on or about an unknown date but no earlier than October 19, 2015, in Los Angeles County, within the Central District of California and elsewhere, defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi" ("defendant SHIH"), and KIET ANH MAI ("defendant MAI"), together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to intentionally access without authorization a protected computer as that term is defined in Title 18, United States Code, Section 1030(e)(2)(B), and thereby obtain information (1) for purposes of commercial advantage and private financial gain, (2) in furtherance of a criminal act in violation of United States laws, namely, violations of the International Emergency Economic Powers Act, mail fraud, and wire fraud, and (3) the value of which information exceeded $5,000, all in violation of Title 18, United States Code, Section 1030(a)(2)(C) and (c)(2)(B)(i)-(iii).

B.   THE MANNER AND MEANS OF THE CONSPIRACY

2.     The object of the conspiracy was carried out, and to be carried out, in substance, as follows:

a.     Defendant MAI would, by misrepresentations and concealment of material facts, obtain from U.S. Company B confidential information, including a unique user identification and password, that enabled defendant MAI to access a computer owned by U.S. Company B that contained U.S. Company B's proprietary information.

36

1       b.    Defendant MAI would provide this unique user
2 identification and password to defendant SHIH to enable defendant
3 SHIH to access a computer owned by U.S. Company B that contained U.S.
4 Company B's information without U.S. Company B's knowledge or
5 authorization.

6       c.    Defendant SHIH would, without authorization, access a
7 computer owned by U.S. Company B and obtain U.S. Company B's
8 information.

9 C.   OVERT ACTS

10    3.   In furtherance of the conspiracy, and to accomplish its
11 object, defendants SHIH and MAI, together with others known and
12 unknown to the Grand Jury, committed the following overt acts, among
13 others, in the Central District of California and elsewhere:

14    Overt Act #1:  On or about February 15, 2013, defendant MAI,
15 using a MICROEX e-mail address, sent an e-mail to U.S. Company B,
16 with the subject "Foundry service," stating "I'm interested in the
17 Full-Wafer Service for GaN, 0.25um process.  Please send documents
18 to: Kiet Mai, President, MicroEx Engineering."

19    Overt Act #2:  On or about February 15, 2013, defendant MAI,
20 sent an e-mail to defendant SHIH, stating "Please answer the attached
21 for me, I don't want to make any mistakes."  Attached to the e-mail
22 was a "[U.S. Company B] Export Compliance Questionnaire" that
23 defendant MAI had received from U.S. Company B in response to the e-
24 mail described in Overt Act #1.

25    Overt Act #3:  On or about February 15, 2013, defendant SHIH
26 sent an e-mail to defendant MAI, attaching the completed U.S. Company
27 B Export Compliance Questionnaire.  The space provided for a "no"
28 response was checked in response to questions as to whether the

product would be subject to "U.S. export control regulations, specifically EAR and ITAR."

Overt Act #4:  On or about February 18, 2013, defendant MAI signed U.S. Company B's Process Design Kit ("PDK") on behalf of MICROEX as the customer.  The PDK covered, among other things, the license and restrictions on use, export and import requirements, and written assurances, that included, among other conditions, that "Customer's rights may not be transferred, leased, assigned, or sublicensed to any other party.  Customer may not allow any other party to use the Licensed Program."

Overt Act #5:  On or about February 18, 2013, defendant MAI, using a MICROEX e-mail address, e-mailed U.S. Company B and returned the completed U.S Company B Export Questionnaire and the signed PDK.

Overt Act #6:  On or about February 18, 2013, defendant MAI, using a MICROEX e-mail address, sent an e-mail to U.S. Company B answering "yes," in response to the question, "Will your company be doing the design, testing and use of the MMIC's?"

Overt Act #7:  On or about March 19, 2013, defendant MAI, sent an e-mail to defendant SHIH advising him that defendant MAI would forward to defendant SHIH the information he had received from U.S. Company B and stating further, "The only issues would be end user and itar and you already are aware of those."

Overt Act #7:  On or about March 19, 2013, defendant MAI sent an e-mail to SHIH, stating "Here's design access," that provided to defendant SHIH the internet address for the design portal on U.S. Company B's computer, as well as the user name and password necessary to access that design portal.

Overt Act #8:  Between March 19, 2013 and March 18, 2015, defendant SHIH accessed, without authorization, U.S. Company's B's protected computer.

Overt Act #9:  On or about August 29, 2013, defendant MAI sent an e-mail to defendant SHIH informing SHIH that U.S. Company B wanted to know when they would place a purchase order, and that defendant MAI told U.S. Company B, "we're finalizing the layout and [would] get back to them early next week."

Overt Act #10:  On or about August 29, 2013, defendant SHIH sent an e-mail to defendant MAI responding to the e-mail in Overt Act #8, writing, "Good answer!  We do plan to release the PO [purchase order] next week."

Overt Act #11:  On or about September 4, 2013, defendant MAI e-mailed U.S. Company B, attaching a purchase order from MICROEX that listed payment milestones totaling $130,000 for "Delivery of 4 good wafers [MMICs]."

Overt Act #12:  On or about September 6, 2013, defendant MAI caused a MICROEX invoice to be issued that billed PULLMAN LANE for milestone payment 1 -- $28,750 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #13:  On or about September 10, 2013, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $28,750, made payable to MICROEX.

Overt Act #14:  On or about September 11, 2013, defendant MAI caused a check to be issued, written on a MICROEX bank account, in the amount of $25,000, made payable to U.S. Company B.

Overt Act #15:   On or about November 22, 2013, defendant MAI caused a MICROEX invoice to be issued that billed PULLMAN LANE for a milestone payment -- $40,250 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #16:   On or about November 22, 2013, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $41,228, made payable to MICROEX.

Overt Act #17:   On or about December 2, 2013, defendant MAI caused a check to be issued, written on a MICROEX bank account, in the amount of $35,000, made payable to U.S. Company B.

Overt Act #18:   On or about December 6, 2013, defendant MAI caused a MICROEX invoice to be issued that billed PULLMAN LANE for milestone payment 3 -- $69,000 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #19:   On or about December 11, 2013, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $69,000, made payable to MICROEX.

Overt Act #20:   On or about December 16, 2013, defendant MAI sent an e-mail to defendant SHIH informing defendant SHIH that U.S. Company B wanted the last invoice paid before shipping the MMICs, and that defendant MAI would send defendant SHIH the final invoice as soon as defendant MAI received U.S. Company B's invoice.

Overt Act #21:   On or about December 17, 2013, defendant MAI caused a MICROEX invoice to be issued that billed PULLMAN LANE for milestone payment 4 -- $11,500 -- for the "NPN, Wideband, High Power

GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #22:  On or about December 18, 2013, defendant MAI sent an e-mail to defendant SHIH informing defendant SHIH, "I remitted payment for the final invoice today, [U.S. Company B] should receive it this week.  I'll check with them by the end of this week for the expected delivery of the wafers."

Overt Act #23:  On or about December 24, 2013, defendant MAI caused $70,000 to be wire-transferred to U.S. Company B.

Overt Act #24:  On or about December 27, 2013, defendant MAI sent an e-mail to defendant SHIH, writing "I have the wafers."

Overt Act #25:  On or about December 27, 2013, defendant SHIH sent an e-mail to defendant MAI responding to the e-mail described above in Overt Act #24, writing, "Super.  I'm out of town.  I'll pick it up this weekend.  Thanks."

Overt Act #26:  On or about January 3, 2014, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $11,500, made payable to MICROEX.

Overt Act #27:  On or about March 19, 2014, defendant SHIH sent an e-mail to defendant MAI, writing, "[T]he GaN MMIC's are still under evaluation.  Some of them have good performance.  We are looking [sic] potential customers for the Ku-band chips for satcom applications.  Please ask [U.S. Company B] about the pricing for production wafers of the order of 30 to 60 wafers."

Overt Act #28:  On or about March 20, 2014, defendant MAI sent an e-mail to defendant SHIH, writing, "In regard to [U.S. Company B], have you checked the ITAR on these parts due to high power?"

Overt Act #29:   On or about June 16, 2014, defendant MAI, using a MICROEX e-mail address, sent an e-mail to U.S. Company B, writing, "We'd like to have another wafer run . . . . Please quote with new payment terms for a run same as last run."

Overt Act #30:   On or about December 1, 2014, defendant MAI, using a MICROEX e-mail address, sent to U.S. Company B a purchase order from MICROEX, for a payment schedule by milestones of $130,000 total.

Overt Act #31:   On or about December 1, 2014, defendant MAI, using a MICROEX e-mail address, answered an e-mail from U.S. Company B, asking "Will you be exporting any of the devices or wafers?"   The answer provided by defendant MAI was "No not for export, we're doing development."

Overt Act #32:   On or about December 1, 2014, defendant MAI, using a MICROEX e-mail address, sent an e-mail to U.S. Company B, advising that MICROEX would go with the full payment option, and attaching a revised purchase order from MICROEX, for a full payment of $117,000.

Overt Act #33:   On or about December 1, 2014, defendant MAI, caused a MICROEX invoice to be issued that billed JYS TECH for milestone payment 1 -- $120,000 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #34:   On or about December 10, 2014, defendant MAI, using a MICROEX e-mail address, answered an e-mail from U.S. Company B, asking "Are any of the design[s] you are putting on this next mask subject to US ITAR export regulations?"   The answer provided by

1  defendant MAI was "These are for research study and should not [sic]

2  subject to ITAR."

3      Overt Act #35:  On or about December 17, 2014, defendant MAI

4  caused $117,000 to be wire-transferred to U.S. Company B.

5      Overt Act #36:  On or about March 18, 2015, defendant SHIH sent

6  an e-mail to defendant MAI, telling him to call Person 6 to pick up

7  the package for defendant SHIH when it arrived.

8      Overt Act #37:  On or about March 23, 2015, defendant MAI, sent

9  an e-mail to defendant SHIH, writing "I left [Person 6] voice and

10  text messages for picking up the wafers, which arrived today."

11      Overt Act #38:  On or about March 23, 2015, defendant MAI,

12  caused a MICROEX invoice to be issued that billed JYS TECH for the

13  final payment -- $14,550 -- for the "NPN, Wideband, High Power GaN

14  MMIC Design, Analysis, Layout & Test Support" provided by U.S.

15  Company B.

16      Overt Act #39:  On or about March 25, 2015, defendant MAI, sent

17  an e-mail to defendant SHIH, writing, "[Person 6] picked-up the

18  wafers today, wafers' data/packing slip attached."  Attached to the

19  e-mail was a U.S. Company B packing slip that listed 4 diced wafers:

20  BU1823-11, HG0752-36, JE0628-20 and JH0727-45, valued at $9,000.

21      Overt Act #40:  On or about April 17, 2015, defendant MAI, sent

22  an e-mail to defendant SHIH asking whether JYS TECH would be sending

23  the last payment to MICROEX soon for the U.S. Company B wafers, and

24  attaching a MICROEX invoice to JYS TECH for $14,550.

25      Overt Act #41:  On or about October 19, 2015, defendant SHIH

26  caused to be issued a check, written on a PULLMAN LANE bank account,

27  in the amount of $14,550, made payable to MICROEX.

28

COUNT TEN

[18 U.S.C. §§ 1956(a)(2)(A), 2(a)]

On or about December 12, 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi" and KIET ANH MAI knowingly aided, abetted, counseled, commanded, induced, and procured another person to transport, transmit, and transfer a monetary instrument and funds, that is, USD $120,000, to a place in the United States, within the Central District of California, specifically, a MICROEX bank account, from or through a place outside the United States, specifically, a JYS TECH bank account in Canada, with the intent to promote the carrying on of specified unlawful activity, specifically, violations of Title 18, United States Code, Sections 1030 (fraud and related activity in connection with computers), 1341 (mail fraud), and 1343 (wire fraud), and Title 50, United States Code, Section 1705 (violations of the International Emergency Economic Powers Act).

COUNT ELEVEN

[18 U.S.C. § 1001(a)(2)]

On or about January 19, 2018, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, specifically, the Federal Bureau of Investigation ("FBI"), defendant YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi," knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation, in that defendant SHIH told an FBI Special Agent the following:

- No U.S. Company B wafers (aka MMIC Amplifiers) went to China;

- No U.S. Company B wafers (aka MMIC Amplifiers) went to Hong Kong;

- Defendant SHIH was not working on GaN in China.

Whereas, in truth and in fact, as defendant SHIH then knew:

- The U.S. Company B wafers (aka MMIC Amplifiers) did go to China;

- The U.S. Company B wafers (aka MMIC Amplifiers) did go to Hong Kong;

- Defendant SHIH was working on GaN in China.

COUNT TWELVE

[26 U.S.C. § 7206(1)]

On or about January 3, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendant YI-CHI SHIH, also known as ("aka") "Yichi Shih", aka "Yuqi Shih", did willfully make and subscribe a joint U.S. Individual Income Tax Return, for the calendar year 2011, which was verified by a written declaration that it was made under penalties of perjury, and which he did not believe to be true and correct as to every material matter. That income tax return, which was prepared and submitted within the Central District of California, and was filed with the Internal Revenue Service, reported on Line 22, total income of $232,282, whereas, as he then and there knew, he received substantially more total income during the 2011 calendar year than the amount reported on his 2011 Joint Federal Income Tax Return.

COUNT THIRTEEN

[26 U.S.C. § 7206(1)]

On or about June 24, 2013, in Los Angeles County, in the Central District of California, and elsewhere, defendant YI-CHI SHIH, also known as ("aka") "Yichi Shih", aka "Yuqi Shih", did willfully make and subscribe a joint U.S. Individual Income Tax Return, for the calendar year 2012, which was verified by a written declaration that it was made under penalties of perjury and which he did not believe to be true and correct as to every material matter. That income tax return, which was prepared and submitted in the Central District of California, and was filed with the Internal Revenue Service, reported on Line 22, total income of $287,863, whereas, as he then and there knew, he received substantially more total income during the 2012 calendar year than the amount reported on his 2012 Joint Federal Income Tax Return.

COUNT FOURTEEN

[26 U.S.C. § 7206(1)]

On or about June 14, 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendant YI-CHI SHIH, also known as ("aka") "Yichi Shih", aka "Yuqi Shih", did willfully make and subscribe a joint U.S. Individual Income Tax Return, for the calendar year 2013, which was verified by a written declaration that it was made under penalties of perjury and which he did not believe to be true and correct as to every material matter.  That income tax return, which was prepared and submitted in the Central District of California, and was filed with the Internal Revenue Service, reported on Line 9a, ordinary dividends of $42,256, whereas, as he then and there knew, the amount of ordinary dividends he earned during the 2013 calendar year was substantially greater than the amount reported on his 2013 Joint Federal Income Tax Return.

COUNT FIFTEEN

[18 U.S.C. § 1001(a)(1)]

On or about May 6, 2014, in Los Angeles County, within the Central District of California, defendant YI-CHI SHIH, also known as ("aka") "Yichi Shih", aka "Yuqi Shih", did willfully and knowingly conceal and cover up by trick, scheme and device a material fact which he had a duty to report, in a matter within the jurisdiction of the executive branch of the Government of the United States, namely the Department of the Treasury, to wit: defendant SHIH submitted and caused to be submitted to the Department of the Treasury an FBAR, FinCen Form 114, that concealed and covered up the fact that, during calendar year 2013, he had a financial interest in, and signature authority over, bank, securities, and other financial accounts at Standard Chartered Bank (Hong Kong) Limited, in Hong Kong, with an aggregate value in excess of $10,000, and that, during calendar year 2013, he had a financial interest in, and signature authority over, a bank, securities, and other financial accounts at the Hong Kong Branch of Coutts & Co., Ltd., in Hong Kong, with an aggregate value in excess of $10,000.

COUNT SIXTEEN

[18 U.S.C. § 1001(a)(1)]

On or about June 18, 2015, in Los Angeles County, within the Central District of California, defendant YI-CHI SHIH, also known as ("aka") "Yichi Shih", aka "Yuqi Shih", did willfully and knowingly conceal and cover up by trick, scheme and device a material fact which he had a duty to report, in a matter within the jurisdiction of the executive branch of the Government of the United States, namely the Department of the Treasury, to wit: defendant SHIH submitted and caused to be submitted to the Department of the Treasury an FBAR, FinCen Form 114, that concealed and covered up the fact that, during calendar year 2014, he had a financial interest in, and signature authority over, bank, securities, and other financial accounts at Standard Chartered Bank (Hong Kong) Limited, in Hong Kong, with an aggregate value in excess of $10,000, and that, during calendar year 2014, he had a financial interest in, and signature authority over, a bank, securities, and other financial accounts at the Hong Kong Branch of Coutts & Co., Ltd., in Hong Kong, with an aggregate value in excess of $10,000.

COUNT SEVENTEEN

[18 U.S.C. § 1001(a)(1)]

On or about April 9, 2016, in Los Angeles County, within the Central District of California, defendant YI-CHI SHIH, also known as ("aka") "Yichi Shih", aka "Yuqi Shih", did willfully and knowingly conceal and cover up by trick, scheme and device a material fact which he had a duty to report, in a matter within the jurisdiction of the executive branch of the Government of the United States, namely the Department of the Treasury, to wit: defendant SHIH submitted and caused to be submitted to the Department of the Treasury an FBAR, FinCen Form 114, that concealed and covered up the fact that, during calendar year 2015, he had a financial interest in, and signature authority over, bank, securities, and other financial accounts at Standard Chartered Bank (Hong Kong) Limited, in Hong Kong, with an aggregate value in excess of $10,000.

COUNT EIGHTEEN

[18 U.S.C. § 1001(a)(1)]

On or about April 12, 2017, in Los Angeles County, within the Central District of California, defendant YI-CHI SHIH, also known as ("aka") "Yichi Shih", aka "Yuqi Shih", did willfully and knowingly conceal and cover up by trick, scheme and device a material fact which he had a duty to report, in a matter within the jurisdiction of the executive branch of the Government of the United States, namely the Department of the Treasury, to wit: defendant SHIH submitted and caused to be submitted to the Department of the Treasury an FBAR, FinCen Form 114, that concealed and covered up the fact that, during calendar year 2016, he had a financial interest in, and signature authority over, bank, securities, and other financial accounts at Standard Chartered Bank (Hong Kong) Limited, in Hong Kong, with an aggregate value in excess of $10,000.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461]

1.    Pursuant to Rule 32.2(a), of the Federal Rules of Criminal Procedure, notice is hereby given to defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi," ISHIANG SHIH, aka "I-Shiang Shih," KIET ANH MAI, JIERU DENG, aka "Deng Jieru," aka "Angel Deng," YAPING CHEN, aka "Chen Yaping," FEI YE, aka "Yeh Fei," aka "Michael Ye," aka "Michael Jackson," aka "Michael Anderson," aka "Michael Dickinson," and YE YUAN, aka "Yuan Ye," (collectively, "defendants") that the United States will seek forfeiture as part of any sentence in accordance with COUNTS ONE through SEVEN, and TEN of this Indictment.  Each defendant so convicted shall forfeit to the United States:

  a. all property, real or personal, which constitutes or is derived from proceeds traceable to the underlying violation; and

  b. to the extent such property is not available for forfeiture, a sum of money equal to the total value of such property.

2.    Pursuant to Title 21, United States Code, Section 853(p), defendants shall forfeit substitute property, if, by any act or omission of defendants, the property described in COUNTS ONE through SEVEN, and TEN, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982(a)(2)]

1.   Pursuant Rule 32.2(a), Fed. R. Crim. P., notice is hereby given to defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi," and KIET ANH MAI (collectively, "defendants"), that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(2), in the event of any defendant's conviction under COUNTS EIGHT and NINE of this Indictment.

2.   Each defendant so convicted shall forfeit to the United States the following property:

     a.   Any property constituting, or derived from, proceeds obtained, directly or indirectly, as the result of such violation.

     b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of such property.

3.   Pursuant to Title 21, United States Code, Section 853(p), and Title 18, United States Code, Section 982(b)(1), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph, if, as a result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof, (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

## FORFEITURE ALLEGATION THREE

[18 U.S.C. § 982(a)(1)]

1.    Pursuant to Rule 32.2(a), of the Federal Rules of Criminal Procedure, notice is hereby given to defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi," and KIET ANH MAI (collectively, "defendants") that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of any defendant's convictions under COUNT ELEVEN this Indictment.

2.    Each defendant so convicted shall forfeit to the United States the following property:

(a)  all right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in COUNT ELEVEN of this Indictment; and

(b)  th the extent such property is not available for forfeiture, a sum of money equal to the total value of such property.

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), each defendant shall forfeit substitute property, up to the value of the total amount described in paragraph 2, if, as the result of any act or omission of a defendant, the property described in paragraph 2, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the

//
//
//
//

1  court; (d) has been substantially diminished in value; or (e) has

2  been commingled with other property which cannot be divided without

3  difficulty.

4                                          A TRUE BILL

5

6                              _____/S/_____
                               Foreperson

7

8  NICOLA T. HANNA
   United States Attorney

9

10

11  PATRICK R. FITZGERALD
    Assistant United States Attorney

12  Chief, National Security Division

13  CHRISTOPHER GRIGG
    Assistant United States Attorney

14  Chief, Terrorism and Export
       Crimes Section

15

16  JUDITH A. HEINZ
    Assistant United States Attorney

17  Senior Litigation Counsel
    National Security Division

18  JAMES HUGHES
    Assistant United States Attorney

19  Tax Division

20  WILLIAM ROLLINS
    Assistant United States Attorney

21  Terrorism and Export Crimes
       Section

22

23  MELANIE SARTORIS
    Assistant United States Attorney

24  Terrorism and Export Crimes
       Section

25  KHALDOUN SHOBAKI
    Assistant United States Attorney

26  Cyber and Intellectual Property
       Crimes Section

27

28